IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COLLINS NATIONAL, a limited partnership, and COLLINS DEVELOPMENT CO., a California corporation as General Partner,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

No. 05-563C
(Judge Baskir)

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC") and the Special Procedures Order, defendant, the United States, respectfully requests that the Court grant summary judgment in favor of defendant upon plaintiff's asbestos abatement claim. In support of this motion, we rely upon the complaint, the following brief, the consolidated statement of uncontroverted facts and appendix to be filed upon completion of briefing.

STATEMENT OF THE ISSUES

1. Whether, under the terms of the lease, the Government as lessee possessed a duty to abate the asbestos upon expiration of the lease.

2. Whether the Government as lessee possessed a duty to abate the asbestos under the implied common law duty not to commit waste.

3. Whether the Government possessed a duty to abate the vinyl asbestos tiles under the Spearin doctrine.

STATEMENT OF FACTS

On August 28, 1974, the General Services Administration ("GSA") issued a solicitation for proposals to lease a total of 33,750 square feet of space in National City, California, to house the District Office of the Drug Enforcement Agency ("DEA"), and its Regional Laboratory. App. at 1. The solicitation contained general building requirements and specifications and requested that offerors submit floor plans and information showing how those specifications would be met.[1] App. at 14.

On October 31, 1974, Collins National ("Collins") submitted its initial proposal to lease space to the United States in the rental amount of $280,000 a month for the initial term. App. at 65. Collins' offer was subsequently amended on December 13, 1974, January 17, 1975, March

[1] The solicitation originally stated that the floors in all office spaces and corridor areas shall be covered with vinyl asbestos. App. at 17. This was, however, amended to state that all office spaces and corridor areas shall be covered with carpeting. App. at 26.

12, 1975, and May 30, 1975. App. at 72-80. On December 13, 1974, Collins amended its bid to include vinyl asbestos tile and base, which reduced the proposed rental amount. App. at 74. On January 17, 1975, Collins again stated in its correspondence: "If, however, you desire to use an alternate grade of carpet or VAT [vinyl asbestos tile], a savings would be obtained per our letter dated October 31, 1974." App. at 77. Due to other cost savings proposed, Collins' final bid amount was a monthly rent in the amount of $225,795. App. at 80.

On June 13, 1975, the GSA accepted Collins' offer and entered into a ten-year lease of the building located at 402 West 35th Street, National City, California (Lease No. 09B-74817). App. at 81-82. The lease specified that vinyl asbestos tiles be used in certain rooms in the Regional Laboratory, including the gas storage room, main laboratory one and two, special purpose laboratory, men's and women's locker rooms, employees lounge, vault, administrative storage room, fingerprint room, the chemical storage and glassware storage rooms. App. at 124-28. The lease did not otherwise specify any asbestos-containing materials ("ACMs") that were required to be used in the building. App. at 82-150.

Under the terms of the lease, Collins was required to maintain the exterior and interior of the building, including but not limited to maintaining the mechanical and electrical equipment and systems, elevators and escalators, fire equipment, plumbing and sewage systems, painting, and providing cleaning and janitorial services. App. at 106-111. The lease further provided that Collins National would maintain the premises in "good repair and tenantable condition." App. at 119. The lease also stated that Collins National was required to "comply with all codes and ordinances applicable to the ownership and operation of the building . . . and, at his own expense, to obtain all necessary permits and related items." App. at 112, 120.

The lease further stated that the "Government shall have the right during the existence of the lease to make alterations, attach fixtures and erect conditions, structures or signs in or upon the premises. . . ." App. at 119. The lease specified that the fixtures, additions or structures "attached to the said premises shall be and remain the property of the Government and may be removed or otherwise disposed of by the Government." Id. The lease did not contain a clause requiring the Government to restore the premises to its original condition. App. at 82-150.

On March 4, 1985, the GSA notified Collins that it was "surveying all leased space to determine which buildings contain friable or asbestos bearing materials" and requested Collins to complete an asbestos certification. App. at 151. In response, Collins procured the services of Environmental Systems Associates ("EVA"), an industrial hygiene company, to conduct a survey of the building to determine if there was any asbestos in the building. App. at 152. EVA inspected all areas of the building and took samples of the floor tiles, sprayed-on accoustical ceiling material, material used in the drop ceiling, selected fume hoods, and gloves used in the laboratory. Id. EVA found chrysotile asbestos in the fume hoods and gloves used in the laboratory. Id. EVA stated that the asbestos in the laboratory fume hoods was intact and no exposed areas were observed. Id. EVA advised safety personnel to "label the suspect material for future reference and if any drilling, grinding, or abrasion of the surface is attempted, wet methods should be used and the cleanup of any debris from such activity should be done with proper equipment." Id. EVA represented that there were no other ACMs on the premises. Id.

On August 28, 1986, the GSA discovered via an inspection performed by the Facility of Safety and Health that decorative ceiling

material applied in the laboratory and office space also contained 10-15% chrysotile asbestos. App. at 213. On October 16, 1986, the GSA informed Collins that it had discovered asbestos in the decorative ceiling material and requested that Collins comply with all aspects of PBS.P.5900.2B, Section 015546, Safety and Health requirements. App. at 214.

On May 1, 1986, the GSA issued another solicitation to lease the building at 402 West 35th Street, National City, California. App. at 155. On November 25, 1986, the GSA entered into a new lease (Lease No. 09B-86764) with Collins to lease the building from November 1, 1986 to October 31, 1991. App. at 216. On November 25, 1986, the GSA and Collins also entered into a supplemental lease agreement, which inserted the following paragraph regarding asbestos control: "14. It is agreed and understood between the Lessor and the Government that the precautions for the control of asbestos outlined in PBS.P.5900.2B, Section 01546, Safety and Health, will be observed." App. at 266. Supplemental lease agreements extended the lease period until April 30, 2003. App. at 267-79.

The 1986 lease, like the prior lease, provided that Collins was responsible for maintaining the premises in good repair and tenantable condition, and that Collins was responsible for complying with all applicable

codes and ordinances related to ownership and operation of the building. App. at 248. In addition to these provisions, the 1986 lease contained several provisions specifically related to asbestos. The lease, which incorporated the terms of the solicitation,[2] contained a clause entitled "Asbestos." That clause stated:

> No asbestos-containing fireproofing or insulation on building structures, accoustical treatment, molded or wet-applied ceilings or wall finishes/decorations, whether friable or non-friable, will be permitted. If present, such materials must be removed by the successful offeror prior to occupancy by the Government.
>
> No friable asbestos-containing boiler lagging or pipe insulation is acceptable. If present, such materials shall be removed, encapsulated or enclosed.
>
> Post-asbestos-abatement air monitoring requirements, in accordance with GSA procedures, are to be complied with by the lessor when applicable.

App. at 237. Collins National certified and represented in the 1986 lease that the building complied with requirements in the Asbestos clause. App. at 262. The lease granted the Government "the right, upon reasonable notice, to inspect and perform bulk sampling and analysis of suspected

---

[2] Some of the provisions in the solicitation were marked "Acceptable as is." App. at 218. However, the Asbestos clause was not marked "Acceptable as is." App. at 237.

asbestos-containing materials and to monitor the air for asbestos fibers." App. at 248. The lease also allowed the Government to terminate the lease if Collins National had misrepresented the presence of asbestos in its certification or to require Collins National to remove or otherwise abate and control any friable asbestos in the building. App. at 251.

On August 8, 1989, a report indicated that a major renovation was in progress without adequate asbestos precautions. App. at 291. The 1989 report noted that there was asbestos in two places: (1) friable asbestos in the sprayed-on acoustical ceiling material found in the corridors, evidence vaults, and some offices (about 12,000 feet), and (2) non-friable asbestos in the floor tile and mastic (about 20,000 feet). App. at 295. In response, on September 12, 1989, Collins hired a contractor to abate friable asbestos on the accoustical ceiling material. App. at 313. The contractor hand-scraped the accoustical ceiling material using wet removal procedures and disposed of the material. Id.

In 1990, Collins tested for asbestos in the vinyl floor tiles and mastic. App. at 314. The test results showed two percent chrysotile asbestos in the mastic only. Id. Collins believed that the asbestos, as it exist[ed], [wa]s in a safe 'non-friable' state and [wa]s considered a non-hazard." App. at

315. Collins proposed that the existing flooring should be left alone and that new vinyl floor should be "overlaid" on top of the existing flooring. App. at 314. Collins proposed that only the most severely damaged tile areas should be removed through asbestos abatement procedure. Id. Collins believed that this would result in a "long lasting and durable floor." Id. The GSA concurred with Collins' proposal to remove only the most damaged tiles and overlay new tiles on top of the existing flooring. App. at 319.

On October 12, 2000, the U.S. Public Health Service issued a report of its asbestos investigation of vault one and vault two of the laboratory. App. at 324. The 2000 report found that there was asbestos-containing ceiling texture over-sprayed onto ductwork and piping in both vaults. App. at 325. The report recommended that the asbestos-containing ceiling texture in vault one be removed. Id. Because the asbestos-containing ceiling texture in vault two was in good condition, the report recommended that the ceiling texture in vault two should be placed in an operations and maintenance program until renovation activities or change in condition requires removal. Id. The report also found that the level of airborne asbestos in the building was below the applicable regulations. App. at 329 On December 11, 2000, the GSA informed Collins about the results of this

report and requested that Collins respond with an asbestos abatement plan. App. at 359. On or about August 24, 2001, Collins abated the asbestos in the ceiling overspray in the vault. App. at 361-65.

On or about March 2002, Collins contacted Joseph V. Mottola of San Diego of Commercial Real Estate Services to assist with the "de-commissioning" of the DEA laboratory. App. at 366. Mr. Mottola's recommendation was that "decommissioning should consist of bringing the building to a clean shell condition." Id. The initial scope of work in a memorandum stated: "Provide all necessary labor, materials and equipment to completely 'de-commission' building including demolition, removal of trash and cleanup as required to prepared space for a new tenant." App. at 367. This included removal and disposal of the ceilings, HVAC system, restrooms, trade fixtures, fire sprinkler system, gas piping, interior walls, interior surface of roof, floors etc. App. at 368-70.

On December 27, 2002, the URS Corporation performed a pre-renovation/demolition survey for ACMs and other hazardous materials. App. at 375. URS report found friable ACM on spray-on ceiling material located in the hallways, vaults, and offices. App. at 381-82. The URS report further found non-friable ACM in the vinyl floor tiles and mastic;

spray-on ceiling material located in the hallways, vaults, and offices; fume hood transite panels; building joint putty material; and roofing mastic. Id. The report stated[3] in relevant part:

> The presence of ACM in the facility does not mean that the health of the occupants is endangered. If ACM remains in good condition and is not disturbed, exposure to asbestos are expected to be negligible. However, when ACM deteriorates, is disturbed or damaged, such as during renovation or demolition operations, asbestos fibers may be released creating a potential health hazard for building occupants and construction personnel.

App. at 386.

Based on this survey, URS compiled specifications for decommissioning the building. App. at 473. The decommissioning specifications not only included the removal of ACMs in the ceiling material, vinyl floor tiles, roofing mastic, the fume hood transite panels, but also included removal of interior walls, work stations, utilities, holding cells, vaults, the HVAC system, fixtures and plumbing in the bathroom, fire

---

[3] The URS report also found settled dust containing heroin, cocaine, and methamphetamine in the laboratory, the evidence vault, and in the ventilation system. App. at 384. Although drug residue is at issue in this case, this motion does not address plaintiff's drug residue claim. The Government admits that there were trace amounts of drug residue on the premises because it did not perform a wipe down of the premises. There are genuine issues of fact as to whether this trace amount was hazardous and what, if any, was the appropriate remedy.

sprinkler system, incinerator pad, and perimeter fencing etc. App. at 492-96.

The DEA removed its furniture, equipment, and hazardous substances from the building by April 30, 2003, the lease expiration date. App. at 564-85. On April 30, 2003, the contracting officer ("CO") conducted a final walk-through of the building. App. at 586. The CO's report indicates that the "space is ready for return to the Lessor . . . with no damage, other than normal wear & tear that would be expected from a long term tenancy in a laboratory." Id. The report "acknowledged that removal of drug residue has not taken place as of the date of this exit walkthrough." Id.

URS subcontracted the asbestos abatement and demolition work to Clauss Construction ("Clauss"). Clauss performed the work between June and August 2003. App. at 603. On January 26, 2004, URS certified that the asbestos and dust containing controlled substances had been properly removed and disposed of from the DEA facility. Id.

On November 4, 2003, Collins filed a claim with the CO for the amount of costs incurred in removing asbestos and demolishing parts of the building due to the presence of controlled substances. App. at 594-95. Collins also filed a claim for three months of hold-over rent during

which Collins National performed the asbestos abatement and demolition work and one-month of hold-over rent due to the GSA not returning the keys to the building until May 30, 2003. App. at 194.

On November 10, 2004, the CO issued his final decision granting Collins hold-over rent for one month in the amount of $78,865. App. at 622. The CO denied Collins' remaining claims. App. at 622-24. The CO stated that the Government was not responsible for removing ACMs because, except for the vinyl asbestos tiles, Collins chose to employ ACMs throughout the facility of its own accord. App. at 623. The CO further stated that Collins did not establish the presence of drug residue in the premises because URS conducted its test when the laboratory was operational and DEA personnel has since conducted a cleanup of the laboratory and storage areas. Id. The CO also stated that Collins did not demonstrate that the presence of ACMs and drug residue necessitated a demolition of improvements in the building, which Collins likely would have done regardless of the presence of drug residue prior to re-leasing the building to a new tenant. App. at 624.

On May 19, 2005, Collins filed a complaint in the Court of Federal Claims alleging that the Government breached the lease by failing to

remove ACMs and drug residue from the premises upon expiration of the lease.

## SUMMARY OF ARGUMENT

Collins National alleges that the Government breached its duty under the lease by failing to abate asbestos in the building prior to leaving the premises. However, as we demonstrate, under the express terms of the 1986 lease, Collins National, not the Government, possessed the duty to abate any asbestos hazard. The Government further did not possess a duty to abate asbestos under its implied obligation to use the premises with reasonable care and not to commit any waste on the property. Indeed, Collins' own actions in abating asbestos in 1989,1990, and 2001 indicates that the parties understood that Collins, not the Government, was responsible for abating any asbestos hazard in the building.

Collins makes much of the fact that the Government specified the use of vinyl asbestos tiles in the original lease. Presumably, Collins is relying upon the Spearin doctrine, which imposes liability upon the Government when it issues detailed plans and specifications that a contractor is required to follow. The Spearin doctrine, however, is not applicable here because the solicitation specified the Government's space requirements

and requested offerors to provide detailed plans and specifications about how those requirements would be met.

ARGUMENT

I. Standard For Summary Judgment

The procedure of summary judgment is properly regarded not as a disfavored shortcut, but, rather, as an integral part of the Court's rules as a whole, designed to secure a just, speedy and inexpensive determination of every action. Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 89 (1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)); accord Sweats Fashions, Inc. v. Pannill Knitting, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987). Summary judgment "shall be rendered . . . [if] there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." RCFC 56(d). A fact is material if it will make a difference in the outcome of the case. See Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 247-48 (1986).

“As a general proposition, although a lease may concern and convey a property interest, it is very much a contract.” Corman v. United States, 26 Cl. Ct. 1011, 1015 (1992) (citing Keydata Corp. v. United States, 205 Ct. Cl. 467, 482., 504 F.2d 1115, 1123 (1974)). “The interpretation of the

language of a contract is a question of law, not fact." Corman, 26 Cl. Ct. at 1015 (citing Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985); Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 386, 351 F.2d 972, 973 (1965)). "[B]ecause the parties' dispute centers on the interpretation of the terms of the lease, the issue before the court can be viewed as one of law, which may properly be resolved by the court on summary judgment." Corman, 26 Cl. Ct. at 1015.

## II. The Government Did Not Possess The Duty To Abate Asbestos Under The Lease

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of that contract, (3) a breach of that duty, and (4) damage caused by the breach." San Carlos Irrigation And Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Collins alleges that the Government breached the lease by failing to abate and/or remove the asbestos prior to exiting the premises. Compl. ¶¶ 23-25. As we demonstrate below, the express terms of the lease provide that Collins, not the Government, possessed the duty to abate any asbestos hazard.

"Contract interpretation begins with the plain language of the agreement." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir.

1994). "When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all its parts." NVT Technologies, Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "The language of the contract must be afforded the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances." Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971). An interpretation will be rejected if it leaves portions of the contract language useless, inexplicable, inoperative, meaningless, or superfluous. See Blake Constr. Co. v. United States, 987 F.2d 743, 746-47 (Fed. Cir. 1993).

The plain language of both the 1975 and 1986 leases provide that Collins was responsible for maintaining the premises in a safe and tenantable condition. As a matter of general principle, a landlord's duty to maintain the premises (or duty to repair), unlike a tenant's duty to repair, should be construed broadly to include not only ordinary wear and tear but also structural repairs. See Milton R. Friedman, Friedman On Leases, Vol. 1, ¶¶ 10.301, 10.502 (3d. ed. 1990). Collins' duty to maintain the premises, thus, should be broadly construed to include the duty to abate any

asbestos hazard.

The only limitation upon the Collins' duty to maintain the premises or repair contained in the leases is an exception for "case[s] of damage arising from the act of negligence of the Government's agents or employees." App. at 119, 248. Collins has not alleged that the presence of asbestos was caused by any negligence in the Government's use of the premises. Indeed, except for the vinyl asbestos tiles, Collins National chose of its own accord to utilize ACMs in meeting the requirements of the solicitation.

Less there was any doubt about who was responsible for abating asbestos under the original lease, the Government included several provisions in the 1986 lease and supplemental lease agreement addressing the presence of asbestos. First, Collins agreed to comply with the "precautions for the control of asbestos as outlined in PBS.P.5900.2B, Section 01546." App. at 266. Second, Collins represented in the 1986 lease that there were no ACMs in certain parts of the building, including fireproofing or insulation material, accoustical treatment and in the ceilings. App. at 237, 262. Third, Collins agreed that the Government could terminate the lease or require Collins to remove or otherwise abate

asbestos if Collins misrepresented the presence of asbestos in the building. App. at 251. Fourth, to enforce the Government's right to lease a building that did not pose a health hazard to its employees, the 1986 lease gave the Government the right to inspect the premises for the presence of asbestos. App. at 248. Thus, under the terms of the 1986 lease, it is evident that Collins bore the burden of abating any asbestos hazard.

Indeed, the evidence indicates that Collins understood that it was responsible for abating asbestos under the 1986 lease. In 1989, Collins abated the friable asbestos on the accoustical ceiling material. App. at 313. In 1990, Collins removed the damaged vinyl asbestos tiles and overlaid new flooring on top of the old tiles. App. at 314-15. In 2001, Collins abated asbestos in the ceiling texture in vault two of the laboratory. App. at 361-65. Collins own actions throughout the term of the lease, thus, demonstrate the parties' understanding that Collins, not the Government, was responsible for abating any asbestos hazard. "It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become a subject of dispute, is entitled to great weight in its interpretation." Saul Subsidy II Limited Partnership v. Barram, 189 F.3d 1324, 1326 (Fed. Cir. 1999) (quoting Blinderman Constr. Co. v.

United States, 695 F.2d 552, 558 (Fed. Cir. 1982)).

Collins provides no explanation why responsibility for asbestos abatement should have converted to the Government upon expiration of the lease. There was no provision in the lease that required the Government to restore the premises to its original condition. Even if there was such a duty in the lease, there is no evidence that the building in its original condition did not contain ACMs. Therefore, under the express terms of the lease and in accordance with Collins own actions throughout the lease, Collins, not the Government, possessed the duty to abate any asbestos hazard.

## III. The Government Did Not Possess A Duty To Abate The Asbestos Under The Implied Common Law Duty Not To Commit Waste

Collins further alleges that the Government was required to abate asbestos prior to leaving the premises under its common law duty not to commit waste. Compl. ¶¶ 23-25. Collins misunderstands the scope of the implied duty not to commit waste. As we explain below, the Government's implied duty not to commit waste does not extend to abating any asbestos hazard on the premises.

The seminal case addressing a tenant's implied duty not to commit waste is United States v. Bostwick, 94 U.S. 53 (1876). In Bostwick, no

formal lease was executed but the Supreme Court found that a lease arose through the Government's correspondence with plaintiff to lease the premises for use as a military hospital. 94 U.S. at 65. Plaintiff sought damages to the property upon the Government's use of the property. The Court held that, in every lease, there is an "implied obligation on the part of the lessee to so use the property as not unnecessarily to injure it." Id. at 65-66; accord Eaddy v. United States, 134 Ct. Cl. 338, 139 F. Supp. 49 (1956). The Court explained that "[w]hatever damages would necessarily result from a use for the same purpose by a good tenant must fall upon the lessor. All that the relation of landlord and tenant implied in this particular is, that the tenant, while using the property, will exercise reasonable care to prevent damage to the inheritance." Bostwick. 94 U.S. at 66. The Court further stated that the obligations "as to the preservation of property, relate only to the condition of the premises as it was when the term commenced." Id. at 68.

Considering the facts, the Court found that the Government was liable for destroying ornamental trees on the property, tearing down fences and walls, and quarrying stone and gravel from the premises. Id. The Court found that these actions constituted voluntary waste upon the

property. Id. To the contrary, the Court found that the Government was not liable for any damages caused by use of the building as a small-pox hospital because the plaintiff was aware that the building would be used as a small-pox hospital and did not make any objections to such occupancy. Id. at 67. The Court further concluded that the Government was not liable for destruction of part of the building by a fire. Id. at 68. The Court explained that the tenant's implied obligation did not extend to accidental damages and did not bind the tenant to rebuild the property. Id.

Similarly, the Government's implied duty not to commit waste was limited to using the building here as an office space and a drug laboratory with reasonable care. Collins was aware that the building would be used as a drug laboratory. The solicitation informed offerors of the special space requirements of the Government, App. at 14, and Collins voluntarily chose to offer up space for this purpose. Collins does not allege that asbestos abatement was necessitated by the Government's unreasonable use or care of the premises. To the contrary, it is undisputed that, except for the vinyl asbestos tiles, Collins of its own accord chose to use ACMs in certain parts of the building. Accordingly, the Government does not possess a duty to abate any asbestos hazard under any implied obligation under the

lease.

## IV. The Government Does Not Have A Duty To Abate The Vinyl Asbestos Tiles Under The Spearin Doctrine

Collins finally alleges that because the Government specified the use of vinyl asbestos tiles in the original lease, the Government should be liable for removing them. Compl. ¶ 11(b)-(k). Collins appears to rely upon the Spearin doctrine in support of its contention. As we show below, however, the Spearin doctrine is not applicable to the facts of this case.

In United States v. Spearin, 248 U.S. 132 (1918), Spearin had contracted to build a drydock at a Navy shipyard according to very detailed plans and specifications provided by the Navy. 248 U.S. at 133. Spearin was required to relocate a sewer according to the plan, but the plan was defective. Id. at 133-34. The relocated sewer discharged into another sewer, which was itself blocked. Id. The Supreme Court enunciated the general principle that "[i]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." Id. at 136. The Court explained that the "insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that if the specifications were complied with, the sewer

would be adequate." Id. at 137.

In Poorvu v. United States, 190 Ct. Cl. 640, 420 F.2d 993 (1970), this Court's predecessor applied the Spearin doctrine to a situation where the contractor constructed a building according to the Government's plan and specifications and then leased the building to the Government. The Court examined the rationale underlying the Spearin doctrine:

> The reasoning of Spearin is both simple and straight-forward. If the government chooses to have a building built, it may do so in at least two ways: (1) To explain to potential bidders what type of facility it wants and allow the low bidder to design, construct and warrant that building is fit for its intended purpose, or (2) choose to design the building itself and require the low bidder to construct it in accordance with the plans, and warrant that it will have been constructed in a workmanlike manner. If the plans prove insufficient, it is the government, as the owner, upon whom the defects will take their toll.

Poorvu, 420 F.2d at 999. The Court then concluded that the leasing arrangement did not alter the Government's choices of methods of construction and, thus, the Spearin doctrine could be applied where the Government provided a detailed plan or specifications in constructing the building and then leased the building. Id.

Here, similar to Poorvu, Collins decided to construct a building and

then leased the building to the Government. Compl. ¶ 7. Contrary to Poorvu, however, the Government did not provide detailed plans and specifications on how to construct the building. Instead, the Government issued a solicitation explaining the Government's space requirements and asked the offerors to provide detailed plans and specifications on how those requirements would be met. App. at 14. Indeed, Collins' own letters demonstrate that the Government agreed to vinyl asbestos tiles in response to Collins' amended. App. at 74,77. Accordingly, the Government never intended to provide any warranty to Collins regarding the building that was leased.

As in Lopez et al. v. A.C.S. Inc. et al. v. United States, 858 F.2d 712 (Fed. Cir. 1988), the facts of this case do not warrant importing an implied warranty. In Lopez, plaintiffs were workers at a Navy shipyard that suffered injuries due to exposure to asbestos. 858 F.2d at 713. Plaintiffs filed suit against companies that supplied the Navy insulation products that contained asbestos. Id. The companies settled with the plaintiffs and then sought indemnification of the settlement amounts paid from the Government. Id. The companies argued that an implied warranty should be imported to the Government. "The theory is that in specifying asbestos,

the government made an implied warranty to sellers that it own use of the products would not expose the sellers to unforeseen defective product liabilities to persons who might be injured by breathing clouds of asbestos dust, lethal as we now know such clouds to be." Id. at 714.

The Lopez court assumed that the Government specified the use of asbestos in the insulation products, but nonetheless rejected the asbestos suppliers' contention that an implied warranty arose from the fact that the Government specified the use of asbestos in the insulation products. Id. at 714-16. Likewise, an implied warranty did not arise here where the Government merely agreed to Collins' proposal to use vinyl asbestos tiles.

Even if the Court were to apply the Spearin doctrine, summary judgment in favor of defendant is warranted because Collins cannot demonstrate that the vinyl asbestos tiles were defective under the Spearin doctrine. The vinyl asbestos tiles were not defective in the sense that they could not be used for its intended purpose. Further, the asbestos in the tiles was non-friable and Collins itself admitted that they did not provide a health hazard in its non-friable state. App. at 314-15. Thus, there is no evidence that the vinyl asbestos tiles were defective for the purpose for which they were specified.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny plaintiff's claim for damages arising from abating asbestos on the premises.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Bryant G. Snee

BRYANT G. SNEE
Assistant Director

s/ Nancy M. Kim

NANCY M. KIM
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0546
Fax: (202) 514-8640

March 29, 2006

Attorneys for Defendant