IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| COLLINS NATIONAL, a limited partnership, and COLLINS DEVELOPMENT CO., a California corporation as General Partner, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 05-563C (Judge Baskir) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC") and the Special Procedures Order, as amended by Order dated April 28, 2006, plaintiffs Collins National, a limited partnership, and Collins Development Co., a California corporation as general partner of Collins National ("Collins") respectfully requests that the Court deny summary judgment in favor of defendant on Collins' claims related to asbestos abatement. In opposing said summary judgment, Collins relies upon the Complaint, the following brief, the to-be-filed Consolidated Statement of Uncontroverted Facts and the Appendix to be filed upon completion of briefing.

# TABLE OF CONTENTS


Table of Authorities .................................................... ii

I. Statement of the Issues .................................................... 1

II. Statement of the Facts .................................................... 1

III. Summary of the Argument .................................................... 14

IV. Argument .................................................... 15

A. Standard for Summary Judgment .................................................... 15

B. The Lease Documents Neither Make Collins Liable for Nor Exonerate the Government From Asbestos Abatement Under All Circumstances .............................. 17

C. The Government is Responsible to Collins for Damages Suffered as a Result of the Government's Breach of the Implied Covenant Not to Commit Waste. .............................. 20

D. The Government is Responsible for the Costs of Abating Vinyl Asbestos Tile under the *Spearin* Doctrine .............................. 25

V. Conclusion .............................. 29

# TABLE OF AUTHORITIES

## I. Cases


*Boccardo v. U.S.* 341 F.Supp. 858 (N.D. Cal. 1972) ............... 21

*Brown v. Green*, 8 Cal.4th 812, at 817, 884 P.2d 55, 35 Cal.Rptr.2d 598 (1994) ......... ......19, 20

*Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ......... 23, 25

*City of Philadelphia v. Page,* 363 F.Supp. 148 (E.D. Pa. 1973) ................21

*Corman v. U. S.*, 26 Cl.Ct. 1011 (1992) ........................... 20, 21

*Die Casters International Inc. v. U.S.*, 67 Fed.Cl. 362, at 379 (2005) ............... 16

*Hercules Inc. v. U.S.* 516 U.S. 417 (1996) .......................................... 25

*Hughes Transport v. U.S.*, 121 F.Supp. 212, at 228 (Ct.Cl. 1954) ................20

*Kizas v. Webster* 492 F.Supp. 1135 (D.D.C. 1980) ..................................21

*Lopez v. A.C.S. Inc. et all. V. United States*, 858 F.2d 712 (Fed.Cir. 1988) ............... 25

*Minkoff v. Clark Transfer, Inc.* 841 F.Supp. 424 (D.D.C. 1993) ................21

*PCL Construction Services, Inc. v. U.S.,* 47 Fed.Cl. 745 (2000) ............27, 28

*Poorvu v. U. S.* 420 F.2d 993 (Ct.Cl. 1970) ................... 26, 27, 28, 30

*Premier Elec. Const. Co. v. U.S.* 473 F.2d 1372 (7th Cir. 1973) ................21

*Riverview Properties v. U. S.,* 102 F.Supp. 934 (M.D.Pa. 1952 ................29

*Saul Subsidy II Limited Partnership v. Barram*, 189 F.3d 1324, 1326 (Fed.Cir. 1999) ......... 22, 23

*Security Life & Acc. Ins. Co. v. U. S.* 357 F.2d 145, 148 (5th Cir. 1966) ................21

*Snap-On Tools, Inc. v. U.S.* 26 Cl.Ct. 1045, 1052 (1992) ......... 15,16

## I. Cases


*Statesman II Apartments, Inc. v. U.S.*, 66 Fed.Cl. 608 (2005) ................21

*San Nicolas v. U. S.*, 617 F.2d 246 (Ct.Cl. 1980) ............................21

*United States v. Bostwick*, 94 U.S. 53 (1876) .................. 21, 23, 29

*U. S. Gypsum Co. v. Schiavo Bros., Inc.* 485 F.Supp. 46 (E.D. Pa. 1979) aff'd in part, rev'd in part 668 F.2d 172 (3rd Cir. 1981) ............ 21, 23

*U.S. v. Jordan* 186 F.2d 803, 806 -807 (6th Cir. 1951) ............... 21

*United States v. Spearin*, 248 U.S. 132 (1918) ..........................25, 28

*United States v. State National Bank*, 96 U.S. 30 (1877) ............... 20

*Wm. T. Thompson Co. v. U.S.* 26 Cl.Ct. 17, 26 (1992) ........... .........27, 28


## II. Statutes and Rules


Rule 56 of the Rules of the United States Court of Federal Claims ....................................15, 16

Rule 56, Federal Rules of Civil Procedure ..........................................16


## III. Regulations


29 C.F.R. §1910.1001 ............................................3

## I. STATEMENT OF THE ISSUES

1. The Government was obligated as lessee to abate asbestos present in the Premises upon expiration of the lease agreements under the circumstances of this case.

2. The Government was obligated as lessee to abate hazardous drug residue contained in porous asbestos present in the Premises under the implied common law duty not to commit waste.

3. The Government was obligated to abate asbestos-containing vinyl tile on expiration of the lease agreements under the *Spearin* doctrine and under the implied common law duty not to commit waste, among other legal doctrines, as interpreted by the Courts.

## II. STATEMENT OF THE FACTS

In 1974, the General Services Administration awarded Collins the right to build and lease to the GSA an office building to act as the district office and regional laboratory of the Drug Enforcement Agency in the San Diego Region. The building is located at 402 West 35th Avenue, National City, California (the "Premises"). The solicitation for bids included very specific design elements required to be incorporated into the building. (App. 45-64) The original bid proposal called for rent in the amount of $280,000 per month for the initial term. (App. 65) Through extensive negotiations, Collins and the Government agreed to a number of modifications to the original proposal that resulted in reducing rent during the initial term to $225,795. (App. 80) One of the agreed upon modifications was the substitution of asbestos-containing vinyl tile for carpet in many locations in the building. (App. 50-54)

Collins built the building as agreed and the Government executed a ten (10) year lease on June 13, 1975 (the "Lease"). (App. 81-82) The Government required that the building be "of a

type generally recognized as a modern office-type building." (App. 16) Fire safety standards were required to be met as specified. (App. 16-17) Standard procedure for meeting such requirements in 1974 and 1975 included installation of asbestos insulation and "pop-corn" ceilings containing small amounts of chrysotile asbestos. (App. 626)

The Government's specifications also required the installation of asbestos-containing vinyl tile[1] in specified areas throughout the building including the lavatories, holding cells, gas storage room, the main laboratories (labs one and two), the special purpose laboratory, the Mass. Spec. Lab, the X-Ray Lab, the TLC Lab, Instrument labs 1 and 2, the compressor room, the tool workshop room, the file room, the men's and women's locker rooms, the employee's lounge, the vault where drugs, contraband and other evidence were kept, the administrative storage room, the fingerprint room, the chemical storage room and the glassware storage room. (App. 50-54) Approximately 20,000 square feet of vinyl asbestos tile (almost 60% of the building) was installed at the Government's request on the Premises. (App. 295)

The Drug Enforcement Agency took possession of the Premises in 1975. The Lease was extended in March 1985 and the Government issued a solicitation for proposals to provide continuing space to the DEA. At the same time, and consistent with a general GSA procedure, Collins was notified by the GSA that an asbestos survey should be conducted with respect to the building. (App. 151) Collins retained Environmental Systems Associates ("ESA") to conduct the required survey. The copy of the ESA report contained in the Appendix was prepared by ESA on March 20, 1985 and found that asbestos was detected in the laboratory fume hoods and

[1] Vinyl asbestos tile or VAT is applied with asbestos containing mastic. (App. 295)

laboratory gloves.[2] (App. 152) However, a 1989 survey of the building conducted by the Government indicated that "[a] facility health and safety inspection performed in 1985 reported that the ceiling material was an ACM [asbestos-containing material]." (App. 295) It is apparent from that survey that the Government knew of asbestos-containing ceiling treatments before expiration of the Lease. Both the Government and Collins were aware from the inception of the Lease that the specified "vinyl asbestos tile" contained some asbestos.

At the conclusion of the Lease term in 1985, the Government entered into a five month extension with Collins while it prepared a solicitation for either continued occupancy of the Premises or relocation. (App. 378) The Government issued such a solicitation for proposals in May 1986. (App. 155) After extensive negotiations with Collins, the parties executed Lease No. 09B-86764 (the "1986 Lease") which allowed the DEA to continue occupying the Premises (as modified by certain interior changes and improvements). The term of the 1986 Lease was five years with a five year renewal but the Government continued to occupy the Premises by virtue of extensions and agreements through April 30, 2003. The keys were turned over on May 31, 2003. (App. 697)

During the negotiations regarding the 1986 Lease, the Government reported to Collins that a Government safety survey had been conducted at the Premises on August 28, 1986 (some three months before the 1986 Lease was executed). The survey disclosed, among other things that "decorative ceiling material applied in the laboratory and offices contains 10-15% Chrysotile

---

[2] ESA used "polarizing light microscopy" ("PLM") in attempting to determine the presence of asbestos in the ceiling treatment and other locations. OSHA Regulations make it clear that one disadvantage of PLM screening is that "not all fibers may be seen. This is a problem for very low asbestos concentrations where agglomerations or large bundles of fibers may not be present to allow identification by inference." 29 C.F.R. §1910.1001, 1.3 Disadvantages(a).

asbestos." (App. 214) Collins was not asked to "abate" the asbestos discovered in August but rather to comply with the Government's standard asbestos maintenance program for governmental buildings contained in PBS.P.5900.2B, Section 015546. (Id.) Collins agreed to do so.

At the time the 1986 Lease was executed (November 25, 1986) the Government knew:

a) decorative ceiling material applied to the ceilings contained asbestos;

b) laboratory fume hoods and gloves used in the labs contained asbestos; and

c) vinyl asbestos tile covered about 60% of all floors in the Premises.

As part of the 1986 Lease, and contrary to the Government's contentions in this case (*see* Government's Motion, page 7) the Government covenanted that all "[s]pecial space features and improvements within the Government's space are accepted in 'as-is' condition." (App. 241)

To underscore the Government's knowledge of the presence of asbestos-containing materials in the Premises, the parties executed Supplemental Lease Agreement No. 1 which amended the 1986 Lease "effective November 20, 1986" (some five days before the 1986 Lease was signed) to provide for the very asbestos control required of the Government in its October 16, 1986 letter to Collins. (App. 214) This Supplemental Lease Agreement was transmitted to Collins by Gerald Boyer, Realty Specialist, GSA on November 20, 1986. (App. 376) Thus, it is completely disingenuous for the Government to cite to provisions of the General Conditions of the 1986 Lease regarding "asbestos" in the Premises (Government's Motion, pp. 7 and 8) when those provisions were effectively overridden with the consent of all parties *before the 1986 Lease was signed.*

Subsequent to 1986, several issues arose regarding the Premises that in some way

involved asbestos. The asbestos component of each issue was handled differently depending on the context in which it arose.

The first instance resulted from a Government inspection of the Premises during renovation work at the Premises. The renovation was part of the required work under the 1986 Lease that had been deferred until convenient for the DEA. The inspection occurred on August 8, 1989. The inspector noted that the renovation appeared to be happening without regard to any danger from asbestos. (App. 295) Collins was notified on September 11 regarding the issue (App. 377) and on September 12, appropriate action was taken by Collins' contractor to remove approximately 600 square feet of asbestos impacted by the renovation. (App. 313) The costs of dealing with this construction related issue were part of the renovation budget that itself was part of the determining factor for the term of the 1986 Lease and the rent to be paid. (App. 379-380) In essence, the costs were paid by the Government.

The next instance of asbestos involvement concerned the floor tile. A few floor tiles were deteriorating at the Premises as a result of a chemical reaction between the tile and lime and calcium in the sub-floor. (App. 314) Both Collins and the Government were concerned about possible asbestos issues from "vinyl asbestos tile." Collins proposed (App 312) and the Government accepted (App 311) the plan to overlay the vinyl asbestos tile with a new vinyl floor. (App 314) This work was also part of the deferred work originally required under the 1986 Lease (App. 311). The tiles that were removed as part of the work were found not to contain asbestos but the mastic did contain trace amounts of chrysotile asbestos. (App. 317) The costs of the renovation were built into the pricing of the 1986 Lease. (App. 178, 379-380) Once again, the costs were essentially borne by the tenant, the Government.

The third issue involving asbestos concerned an additional safety inspection by Government authorities that occurred in September 2000. The report of that inspection, issued in October, found that spray on ceiling treatment in the Vault areas was in good condition but found that:

> [a]sbestos ceiling texture "over-spray" found on ductwork and piping mainly in vault 1 was found friable and damaged. Loose asbestos ceiling texture debris was found on shelving in vault 1. Apparently the texture is being knocked of[f] the ducts and piping by DEA employees placing and removing evidence boxes from the shelving.

(App. 325) This issue arose only from the carelessness of the DEA employees in knocking asbestos from the duct work. Nonetheless, Collins abated approximately 150 square feet of spray on material from the ducts. (App. 386)

In all three of these instances Collins abated no more than 750 square feet of ceiling material and disposed of non-asbestos-containing tile. The first two instances were part of the planned renovation paid for by the Government in the rental rate (capitalized lease expenditures). The final incident was merely in keeping with the asbestos maintenance protocol that was also negotiated as part of the 1986 Lease compensation.

It is also extremely important to point out that with each "safety" investigation conducted by Government authorities, the most prevalent safety concern related to the dangers of exposure to hazardous and controlled substances. In the report prepared on August 8, 1989, complaints concerning "indoor air quality," marijuana odors, laboratory hoods and ventilation, improper storage of flammables and dry chemical storage were all noted as problems. (App. 291-296).

Moreover, on July 30, 2001, the DEA conducted an internal Industrial Hygiene Survey of the Laboratory. The results of that Survey included a requirement of more thorough cleaning of

surfaces in the laboratory "because of the detection of drug contamination on these surfaces." (App. 361) Ventilation problems were again highlighted in the report. (*Id.*) These two incidents underscore the fact that drug residue contamination in the building was occurring throughout the DEA tenure in the laboratory.

As the lease term (as extended) drew to a close, DEA made it clear that it needed a larger facility and would be vacating the Premises. Maria Dent of the GSA contacted Collins in July 2002 regarding cost estimates for de-commissioning. (App. 634) Ms. Dent told Collins they should contact ONYX Environmental Services regarding a contract to "perform cleanups." (*Id.*) ONYX made arrangements with GSA to visit the DEA laboratory on August 27, 2002, "to determine costs for asbestos abatement following their relocation" and "a cost estimate for chemical relocation as well." (App. 635)

Collins likewise proceeded to secure cost estimates for "decommissioning." Collins retained URS Corporation to perform a decommissioning survey consisting of an assessment of the Premises for "the presence of hazardous materials." (App. 378) URS found both asbestos-containing material (App. 386) and hazardous materials including "settled dust containing heroin, cocaine and methamphetamine" among other drug residue. (App. 387) Based on this survey, URS prepared specifications for decommissioning the building so that bids could be obtained for the anticipated work. (App. 473-562) The results of the Survey and the Specifications were forwarded to GSA for their review so that a practical assignment of responsibility for the costs could be made. (App. 644)

Between August 2002 and May 2003 the GSA was encouraging Collins to secure bids. On August 28, 2002 for instance, Tina Grover at the GSA wrote to inform Collins where to send

"cost proposals" for "the decomissioning of the existing DEA lab." (App. 636) Grover told Collins:

> Jenalyn's office will be evaluating the proposals, monitoring the project, and processing the final payment. I will be issuing the Supplemental Lease Agreement to Collins National who will actually be contracting directly with the vendor. Upon completion of the work and acceptance by the Government, the Government will make a lump sum payment to Collins National for the amount agreed upon.

(App. 636)

GSA was also moving forward with its own analysis of its cleanup responsibility. The GSA internally discussed similar decommissionings of other DEA laboratories, especially the one located in Maryland. (App. 637-639) It was decided to use the Public Health Service to do an inspection to identify "those actions needed to decontaminate the space and return it to the Lessor. " (App. 640) The walk-through with PHS took place on January 9, 2003. (App. 641) The Public Health Service representative was Norman Wright. (App. 643)

Bids received by URS for decommissioning services were delivered to GSA for review on April 11, 2003. (App. 644) Inside GSA, plans were made to review the decommissioning costs in order to reconcile those costs with numbers generated by GSA's own investigations. For instance, the Federal Occupational Health Service estimated it would cost approximately $43,000 for required inspections and sampling necessary to determine the Government's share of clean up costs for the laboratory.[3] (App. 646) In addition, the GSA was keeping track of costs for the relocation of the laboratory from National City to Vista, which included a provision for cleanup costs. The person tasked with this move at DEA was Michael Trevelino; Jenalyn Keodara, a

---

[3] This report erroneously concluded that "[h]azardous materials present prior to the time of occupancy are not the responsible of the government and need not be sampled." This misconception was based on the assumption that the Government had occupied the building for only 17 years, not 29, and that the Government was the only occupant of the building. Nonetheless, it is clear that the Government contemplated some responsibility for decommissioning

GSA property manager, was Trevelino's contact at GSA. (App. 665). Keodara regularly reported to Michael Trevelino on the accumulating costs of the relocation because the DEA had issued a Reimbursable Work Authorization ("RWA") that allowed GSA to charge back to the DEA the costs of relocation of the laboratory and all associated clean-up costs. The initial amount of the RWA was $600,000 and Jenalyn Keodara routinely communicated increases or decreases in costs against the budget established by the RWA. On March 25, 2003, Keodara updated Trevelino, sending him the most recent spread sheet and indicating that "[t]he cost for the environmental clean-up is still pending. We should have a better number sometime next week." (App. 667). The updated worksheet for the RWA reflected a blank space for "Environmental Clean-up in National City Lab." That space was still blank in the transmitted March 25, 2003 worksheet (App. 669), as well as the revised worksheet dated April 5, 2003. (App. 666)

Collins was notified by voice mail on April 29, 2003 that Keodara would conduct a walk through of the Premises on April 30, 2003 at noon. Collins responded that it could not meet that deadline but that all outstanding issues on decommissioning remained and that the Government would be held responsible for its share of decommissioning charges. (App. 670) The Government claims it moved out of the building on April 30 but the keys were not returned to Collins until May 31, 2003. No decommissioning could take place until after GSA vacated the premises and all furniture and fixtures were removed. (App. 672)

A document entitled Condition Survey Report dated April 30, 2003 and signed by Daryl Smith, Contracting Officer, acknowledged "that the removal of drug residue has not taken place as of the date of this exit walkthrough. Upon completion of an analysis of the Lessors [sic]

---

cleanup.

'Decommissioning' package by the Public Health Service, the removal of residue will [be] addressed at that time." (App. 586) Norman Wright, the Environmental Health Manager from the Public Health Service charged with reviewing the URS Decomissioning Survey and federal proposals (and the PHS representative who walked the building in January 2003), indicated in his report on May 2, 2003 that he:

> strongly suggest[ed] that samples be taken from all building material (concrete slab, masonry, vapor barrier, glass, window putty, all insulation, electrical, paint of circuit breaker panels, etc.) to determine if the best way to address the hazardous materials in the facility is to raze the building. **The Government would of course be responsible for the removal of waste.**

(App.675, emphasis added) This position was never communicated to Collins until the exchange of discovery in this action. Mr. Wright also observed that "it is possible that contamination is extensive and that wall[s] will need to be decontaminated . . . ." And Mr. Wright found that the "proposed de-contamination specifications by URS are in keeping with good practice with respect to removal of hazardous materials." (App. 676) Yet the Government never communicated any need for additional testing, never requested that samples be held or otherwise made any request that would have aided the Government in assisting with the decommissioning. All attempts at that time to obtain the Government's cooperation in meeting its recognized obligations were ignored. The Government went silent, and Collins was left to decommission on its own.

The URS specifications that were lauded by Norman Wright provided for demolition of contaminated surfaces and removal of asbestos-containing ceiling material. URS had in fact reviewed whether wiping the surfaces clean or complete removal was more efficient. Ronald A. Miller, the California certified industrial hygienist and certified Asbestos consultant, has declared

in his Affidavit:

> The standard way of addressing drug residue on non-porous surfaces would be to wipe the surface clean with a disinfectant and surfactant, using standard precautions to insure that the cleaning technician did not come in contact with the drugs. However, where the 30 year history of the building indicated that the drug residue had settled into asbestos-containing popcorn ceiling material and other friable asbestos throughout the building, wiping down the surface would release friable asbestos into the air, endangering any further occupant of the building. . . .The least expensive and safest method of dealing with drug contaminated asbestos-containing material was to remove it with normal asbestos protective systems in place.

(App. 627) As Miller pointed out, drug residue had permeated the ceilings and other porous asbestos surfaces throughout the building. (App. 627) This drug residue was the direct responsibility of the Government. (App. 675) Consequently, the most expeditious and efficient way to abate the drug residue contained in the asbestos ceiling and other porous asbestos surfaces was to remove it. (App. 627)

Shortly after he received Mr. Wright's report, the Contracting Officer contacted Collins on May 6, 2003 to let Collins know that GSA had received the Wright report, and the CO would communicate the Government's position on its portion of the responsibility for decommissioning costs "within the next few days." (App. 677) He closed by saying: "[i]t's not been our intention to prolong any of your necessary actions with respect to the decomissioning." (*Id.*)

On May 20, 2003 Michael Trevelino wrote an email to the San Diego GSA saying he had been "blind sided by this RWA [Reimbursable Work Authorization]." (App. 665) The RWA to which he refers is not attached to the email produced (and redacted) by the Government, but it is likely that it was one seeking substantial additional funds to pay for the "environmental cleanup" that Jenalyn Keodara had continuously referenced in her repeated updates to Mr. Trevelino on the costs of the relocation. Until the Contracting Officer's decision rejecting Collins' claim some 18

months later, GSA never contacted Collins to discuss in any manner the Government's shared responsibility for cleanup of the Premises.

Having heard nothing from the Government regarding "necessary actions regarding decomissioning" (App. 677), Collins proceeded to mitigate its damages and take all "necessary actions." Between June 13 and 17, 2003, it conducted a video inspection of the Premises and took over 200 photographs. These photographs (App. 678-696) depict a far different picture than the Government's contention that "the space is ready for return to the Lessor . . . with no damage, other than the normal wear & tear that would be expected from a long term tenancy in a laboratory." (App. 586)

Between June 13, 2003 and August 27, 2003, Collins' subcontractors performed the decomissioning work. The Government was notified of the completion of the work and a Claim was filed with the Contracting Officer on November 4, 2003. Approximately six months later, the Contracting Officer asked for additional information from Collins. (App. 697) This information was promptly made available to the Contracting Officer. (App. 699)

More than eighteen months after the DEA vacated the premises and more than one year after Collins filed its claim, the Contracting Officer issued his opinion awarding Collins' one month's holdover rent but generally denying the remainder of Collins' allegations. (App. 622) The opinion speaks for itself but one point necessitates discussion. The Contracting Officer claimed that "DEA personnel conducted a cleanup of the lab and storages areas subsequent to [the] wipe tests." Yet, the evidence submitted by the Government in the Appendix directly contradicts the CO's statement because on April 30, 2003, the same Contracting Officer stated:

> It is acknowledged that the removal of drug residue has not taken place as of the date of this exit walkthrough. Upon completion of an analysis of the Lessors

> "Decommissioning" package by the Public Health Service, the removal of residue will be addressed at that time.

(App. 586) During the six weeks that followed April 30, 2003, the Government never contacted Collins to raise any concern about the evidence URS had discovered or the concerns Mr. Wright raised concerning sampling. The Government took no steps to participate in decomissioning in any way—even asking for the preservation of samples for later testing. In fact, on March 15, 2004, some 10 months after vacating the Premises, the Contracting Officer was "looking" to *create* evidence that would rebut the review of his own expert, Mr. Wright. On March 14, he wrote the former head of the DEA Laboratory, Bill Phillips, sending him a copy of the Claim filed by Collins and stating: "[w]hat I'm looking for is a write up that indicates that the type of drugs/substances used in the facility could not become embedded in the walls." (App. 703) No "write up" from Mr. Phillips was produced in discovery.

The Complaint in this action was filed in May, 2005. Collins alleged not only that the Government breached the lease agreements by leaving contamination in the premises. Collins also alleged that the Government failed wholly in its obligations to communicate with Collins on the very decommissioning required by the Government. The Government's failure to participate in the decommissioning required by the Government estops it from complaining now about the methods employed and the time it took to accomplish the decontamination of the facility. Collins is now three full years away from the date the Government vacated the Premises and left Collins with the full burden of the decomissioning.

## III. SUMMARY OF THE ARGUMENT

Collins' arguments with respect to the Government's responsibility for asbestos

abatement are threefold:

1. It is completely disingenuous for the Government to contend that the Lease provides that Collins will abate any asbestos hazard when the Government called for 60% of the floors in to the building to be laid with vinyl asbestos tile, when the government knew the location and existence of any asbestos in the building, when the Government with such knowledge accepted the Premises "as-is" in 1986 and when the parties agreed that any maintenance of asbestos would conform with Government requirements at least at the time the 1986 lease was signed, if not before.

2. The Government specified the installation of vinyl asbestos tile in 60% of the building that Collins built specifically for the Government's occupancy. That decision by the Government saved it thousands of dollars over the term of the lease. The Government is responsible under the *Spearin* doctrine and its progeny for damages suffered by a contractor resulting directly from the required use of a specified material. The Government warrants the suitability of the material under *Spearin*. The Government attempts to distinguish *Spearin* by relying on personal injury cases where the warranty invoked under *Spearin* had been held not to be breached (this includes specifically asbestos cases where claims for personal injury have been made). However, the modern cases all distinguish between personal injury (not covered) and construction design warranty claims (covered).

3. The other asbestos-containing material in the Premises was installed by Collins as part of the normal and standard construction procedures employed in 1974 in building a "sound and substantial [building] and of a type generally recognized as a modern office-type building." (App. 627) The government required just such a building. (App. 16) Over the almost thirty year

occupation of the building by the DEA, the walls and surfaces, including the porous surfaces of asbestos-containing material such as the chrysotile ceilings, the spray-on chrysotile insulation and roof mastic, became impregnated with drug residue, including heroin, cocaine, methamphetamine and others. (App. 627) The Government took no steps to remove the drug residue that had accumulated in the building, took no steps to participate in the decision to abate the drug residue in the building, shared no information concerning the drug residue and thus left Collins with the decision how best to remediate the hazardous condition created by the drug residue. (App. 674) The least expensive method of dealing with the drug residue in the chrysotile asbestos was to remove it, not wipe it down and create friable and thus dangerous asbestos contamination. (App. 627)

There are at least triable issues of fact concerning the Government's responsibility to participate in the costs of asbestos abatement throughout the Premises. Consequently, the Government's Motion for Partial Summary Judgment should be denied and the case set for trial on these and all other issues.

## IV. ARGUMENT

### A. Standard for Summary Judgment

A motion for summary judgment in the United States Court of Federal Claims "is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect." *Snap-On Tools, Inc. v. U.S.* 26 Cl.Ct.

1045, 1052 (1992). Precedent under Fed.R.Civ.P. 56 is "relevant to interpreting the RUSCC, including RUSCC 45(c)." *Id.* at 1053. The burden of establishing its entitlement to summary judgment falls to the Government in this case:

> The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding the moving party must meet its burden "by 'showing'-that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."); *see also Riley & Ephriam Constr. Co., Inc.*, 408 F.3d 1369, 1371 (Fed.Cir.2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.")

*Die Casters International Inc. v. U.S.*, 67 Fed.Cl. 362, at 379 (2005). Where the facts are in dispute, the non-moving party is entitled to the benefit of the doubt:

> A trial court is required to resolve all doubt over factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). And, all reasonable inferences and presumptions must be resolved in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *see also Moden,* 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in *380 favor of the party opposing summary judgment.").

Id., at 379-380.

In the instant case, the Government has not filed any affidavits in support of its claims. Rather, it relies only on documents from its files or those of Collins in making its factual contentions. While a party may rely solely on the pleadings in moving for summary judgment, if

> . . . nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,*474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

*Snap-On Tools, Inc. v. U.S.*, *supra*, 26 Cl.Ct. at 1053.

In fact, substantial, genuine issues of material fact exist in this case that make summary judgment inapplicable to even the limited portions of the case to which the Government seeks its application.

B. The Lease Documents Neither Make Collins Liable for Nor Exonerate the Government From Asbestos Abatement Under All Circumstances.

Collins claims in paragraph 24 of its Complaint in this action that the Government breached its obligations under the Lease and the 1986 Lease by returning the Premises to Collins "in a wasted condition contaminated through with asbestos containing material that was required by the initial Lease to be installed, and contaminated with various hazardous and controlled substances resulting from the DEA's use . . . ." The Government recognizes, as it must, that the following facts are not in dispute:

1. Approximately 60% of the floors in the Premises were covered by vinyl asbestos tile.
2. The vinyl asbestos tile was secured to the floor with mastic that contained asbestos.
3. The vinyl asbestos tile had been specified by the Government to be installed in the initial Lease.
4. The DEA drug laboratory generated drug dust and drug residue that permeated the walls, surfaces, porous ceiling tile and porous insulation throughout the Premises.
5. The drug residue contained heroin, morphine, cocaine and methamphetamine, among other controlled substances.
6. The continued presence of such controlled substances was potentially hazardous

to future tenants.

7. Neither the Lease nor the 1986 Lease as amended provided that one party or the other would abate known asbestos at the conclusion of the occupancy, although Collins had undertaken the responsibility to manage known asbestos appropriately throughout the term of the 1986 Lease.

The Government's position on summary judgment assumes that the issues presented by the complaint concern a simple allocation of responsibility for asbestos. That issue is a red-herring. In fact, the contentions made by Collins in the Complaint are (a) that the Government is responsible under the *Spearin* doctrine for removal of asbestos containing materials that it specified for the building, and (b) that the Government is responsible for cleaning up drug residue wherever it is found in the building, including asbestos containing porous material found throughout the Premises.4

The Government's first argument, that the Lease and the 1986 Lease require Collins to abate asbestos under any circumstances, is easily refuted.

First, the argument is not based on any term in either agreement but rather an interpretation suggested by the Government that "Collins' duty to maintain the premises . . . *should be broadly construed* to include the duty to abate any asbestos hazard." (Emphasis added) This claim is made without citation to any lease provision or to any statutory or case law

[4] Collins also alleges in the Complaint that the Government failed wholly in its obligations to communicate with Collins on the very decommissioning required by the Government. The Government's failure to participate in the decommissioning required by the Government estops it from complaining now about the methods employed and the time it took to accomplish the decontamination of the facility. While the estoppel argument is not directly germane to the issues raised by the Government in its motion, the truth is that the Government should be estopped from even asserting the claims made here based on the lack of Governmental participation in choosing the means and methods of abating the contamination for which the Government admits responsibility.

authority.[5]

Second, the 1986 Lease provision regarding asbestos was clearly at odds with what the Government and Collins knew. The "Asbestos" provision, found at App. 237 provides:

> No asbestos-containing fireproofing or insulation on building structures, accoustical treatment, molded or wet-applied ceilings or wall finishes/decorations, whether friable or non-friable, will be permitted. If present, such materials must be removed by the successful offeror prior to occupancy by the Government.
>
> No friable asbestos-containing boiler lagging or pipe insulation is acceptable. If present, such materials shall be removed, encapsulated or enclosed.

Yet five weeks before signing the lease with Collins, GSA notified Collins that GSA was aware of asbestos in the Building and that Collins need only comply with Governmental regulations concerning control of asbestos. (App. 214) Consequently, the parties contemporaneously executed Supplemental Lease Amendment 1 on either November 20 or November 25, 1986 providing that Collins would appropriately manage asbestos on the Premises to insure safe occupancy by the Government. (App. 266) Finally, the Lease itself provided in "Special Space Requirements" that "[s]pecial space features *and improvements* within the Government's space are accepted in 'as-is' condition." (App. 241, emphasis added) The plain language of the 1986 Lease for continued occupation of the Premises was that the Government accepted the "improvements" as they were, including with the variety of asbestos containing material on site.

A clause representing that there is no asbestos in the Premises is completely incompatible

---

[5] In a recent California Supreme Court case, the Court found that the lessee had assumed responsibility for governmentally-mandated asbestos abatement, finding that its conclusion was entirely dependent on the context of the dispute: "As we explain, however, such determinations are usually closely tied, not only to the terms of the lease itself, but to the context in which it is made, assessed in light of a handful of factors designed to elucidate the probable intent of the parties. Contrary to the result we reach in this case, even though a lease may by its terms require the lessee to be responsible for *all* repairs and alterations, without limitation, the legal and practical scope of that duty may well be less, especially where a *short-term* commercial lease is at issue and the cost of compliance is more than a small fraction of the aggregate rent reserved over the life of the lease." *Brown v. Green*, 8 Cal.4th 812, at 817, 884 P.2d 55, 35 Cal.Rptr.2d 598 (1994).

with clauses that accept the improvements "as-is" and that known, existing asbestos will be properly managed. Rules of contract construction assist in resolving any arguable discrepancy. The "rules of law applicable to contracts between individuals apply to authorized contracts with the Government. . . .." *Hughes Transport v. U.S.*, 121 F.Supp. 212, at 228 (Ct.Cl. 1954) (citing *United States v. State National Bank*, 96 U.S. 30 (1877)). Here, the Government drafted the boiler plate language of the 1986 Lease containing the Asbestos provision (App. 237), the "Special Space Requirements" language accepting the Premises "as-is" (App. 241) *and* the Amendment concerning asbestos control. (App. 267) In such circumstances, any ambiguity in the terms of the 1986 Lease should "be construed in favor of the non-drafting party" (here, Collins) based on the following principle:

> . . . as between two reasonable and practical constructions of an ambiguous contractual provision, such as the two proffered by the Government, the provision should be construed less favorably to that party which selected the contractual language. This principle is appropriately accorded considerable emphasis in this case because of the Government's vast economic resources and stronger bargaining position in contract negotiations.

*Corman v. U. S.*, 26 Cl.Ct. 1011, 1017 (1992).

Contrary to the Government's contentions, neither the Lease nor the 1986 Lease assign responsibility for abating asbestos under all circumstances. The Court and the parties must look to the specific instances of abatement required and the lease obligations defining those requirements to assess whether, as a matter of law, the Government has no liability for any cleanup of any asbestos containing materials. *See, Brown v. Green*, 8 Cal.4th 812, at 817, 884 P.2d 55, 35 Cal.Rptr.2d 598 (1994).

C. The Government is Responsible to Collins for Damages Suffered as a Result of the Government's Breach of the Implied Covenant Not to Commit Waste.

The Government recognizes that in every lease with the Government is an "implied obligation on the part of the lessee to so use the property as not unnecessarily to injury it." *United States v. Bostwick*, 94 U.S. 53, 65-66 (1876); Government's brief at 20. The *Bostwick* rule has been universally accepted by federal courts in analyzing waste claims under a government lease. *See, e.g., Premier Elec. Const. Co. v. U.S.* 473 F.2d 1372, 1374 (7th Cir. 1973); *Boccardo v. U.S.* 341 F.Supp. 858, 863 (N.D. Cal. 1972); *Security Life & Acc. Ins. Co. v. U. S.* 357 F.2d 145, 148 (5th Cir. 1966); *U.S. v. Jordan* 186 F.2d 803 (6th Cir. 1951), *806 - 807 (C.A.6 1951); *Minkoff v. Clark Transfer, Inc.* 841 F.Supp. 424, 429 (1993); Kizas v. Webster 492 F.Supp. 1135, 1140 (D.D.C. 1980); *U. S. Gypsum Co. v. Schiavo Bros., Inc.* 485 F.Supp. 46 (E.D. Pa. 1979) aff'd in part, rev'd in part 668 F.2d 172; *City of Philadelphia v. Page* 363 F.Supp. 148, 153 (E.D. Pa. 1973). The Court of Claims recognizes and follows the *Bostwick* rule. *See, e.g. Statesman II Apartments, Inc. v. U.S.*, 66 Fed.Cl. 608, 616 (2005); *Corman v. U.S.*, *supra*, 26 Cl.Ct. at 1016; *San Nicolas v. U. S.*, 617 F.2d 246 (Ct.Cl. 1980).

While recognizing the *Bostwick* rule, the Government then seeks to distinguish its application here by contending (again without citation) that the known use of the Premises as a "drug laboratory" presupposed that drug residue would become imbedded in the property and the landlord accepted that as "reasonable wear and tear." The Government's own evidence substantially contradicts this position.

A government inspection report issued on August 8, 1989 noted "[c]omplaints concerning marijuana odors within the facility" and catalogued the dangers posed by poor "indoor air

quality," laboratory hoods and ventilation, improper storage of flammables and dry chemical storage were all noted as problems. (App. 291-296). In October, 200, carelessness of lab workers was the believed cause of friable asbestos in one of the vault areas. (App. 325) On July 30, 2001, the DEA conducted an internal Industrial Hygiene Survey of the Laboratory. The results of that survey included a requirement of more thorough cleaning of surfaces in the laboratory "because of the detection of drug contamination on these surfaces." (App. 361) Ventilation problems were again highlighted in the report. (Id.)

Until denial of the Collins claim in November, 2004 the Government had never denied responsibility for cleaning up drug residue. In a report prepared by the Federal Office of Health prior to May, 2002, the Office required that the DEA "evaluate and determine what cleanup, if any, is necessary to remove any hazardous materials contamination caused by the government occupancy." (App. 646) In reviewing that report for the GSA, Norman Wright suggested on May 2, 2005 that "samples be taken from all building material . . . to determine if the best way to address the hazardous materials in the facility is to raze the building. *The Government would of course be responsible for the removal of waste*." (App. 674, emphasis added). The Contracting Officer in the Condition Survey Report dated April 30, 2003, distinguished between "normal wear & tear that would be expected from a long term tenancy in a laboratory" and his acknowledgement that "removal of drug residue has not taken place as of the date of this exit walkthrough. Upon completion of an analysis of the Lessors [sic] 'Decommissioning' package by the Public Health Service, the removal of residue will [be] addressed at that time." (App. 586)

Obviously, the Government *always* believed it was responsible for removal of drug

residue contamination from the Premises. As the Government's brief notes, "[i]t is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become a subject of dispute, is entitled to great weight in its interpretation." *Saul Subsidy II Limited Partnership v. Barram*, 189 F.3d 1324, 1326 (Fed.Cir. 1999). Such an interpretation indicates that at least genuine issues of material fact exist regarding the obligations of the Government to clean the Premises upon vacation. Such issues preclude summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The *Bostwick* rationale applies to drug residue left behind by the Government. In *U. S. Gypsum Co. v. Schiavo Bros., Inc., supra*, the Court found that the defendant was responsible for removing junkyard debris after the expiration of the lease for the junkyard. Defendant had argued that it was "customary" to leave such debris. The Court enforced the implied covenant "on the part of the lessee so to treat the demised premises that they may revert to the lessor unimpaired except by the usual wear and tear, and uninjured by any willful or negligent act of the lessee." 485 F.Supp. at 55. The appellate court concurred with the trial judge's holding:

> The obligation of a tenant to return the leasehold property in the condition in which it was received, reasonable wear and tear excepted, is fundamental to the landlord-tenant relationship, even in a commercial setting. A landlord is entitled to presume that the tenant has implicitly promised not to waste the property. For that reason. Only the clearest negation of the obligation will overcome the landlord's lawful expectation.

668 F.2d 172, at 175-176.

In this case, the Government willfully and negligently allowed drug residue to accumulate in the Premises. It was always the intention of the Government (until Collins' claim) to remediate contamination it caused. The Government believed that the protocol used by URS in determining the presence of drugs was "in keeping with good practice with respect to removal of

hazardous materials." (App. 676) The only challenge the Government makes is the misdirected challenge that the "waste" Collins complains of is asbestos. Collins makes no such claim. Collins claims only that porous asbestos containing materials were contaminated by the ubiquitous drug residue. The most efficient method of cleaning and removing the hazardous condition caused by the presence of controlled substances and drug residue was to remove all contaminated material. As pointed out by URS' industrial hygienist in charge of the testing protocol and removal, Ronald A. Miller:

> The standard way of addressing drug residue on non-porous surfaces would be to wipe the surface clean with a disinfectant and surfactant, using standard precautions to insure that the cleaning technician did come in contact with the drugs. However, where the 30 year history of the building indicated that the drug residue had settled into asbestos-containing popcorn ceiling material and other friable asbestos throughout the building, wiping down the surface would release friable asbestos into the air, endangering any further occupant of the building. . . .The least expensive and safest method of dealing with drug contaminated asbestos-containing material was to remove it with normal asbestos protective systems in place.

(App. 627)

The Government was invited to participate in the debate over what possible decontamination strategies were most appropriate. (App. 644, 670, 672) The Government participated for over a year, telling Collins a few days after vacating the Premises that the Government would communicate the government's position on its portion of the responsibility for decommissioning costs "within the next few days." (App. 677) Darryl Smith, the Contracting Officer, closed that email by saying: "[i]t's not been our intention to prolong any of your necessary actions with respect to the decomissioning." (*Id.*) Collins took the necessary actions which included abating the hazardous drug contamination (which included abating porous asbestos surfaces). As the Government has admitted until this case, it is responsible for

waste abatement caused by its occupancy. Its summary judgment motion should be summarily denied as to waste contaminated, abated asbestos containing materials.

D. The Government is Responsible for the Costs of Abating Vinyl Asbestos Tile under the *Spearin* Doctrine.

The Government's final contention is that the doctrine first announced in 1918 in *United States v. Spearin*, 248 U.S. 132, holding the government responsible for the consequences of any material specification, is inapplicable to the facts of this case. Such an argument confuses the difference between tort damages that are not covered by the warranty implied by *Spearin*, and contractual, abatement damages covered by *Spearin*. For that reason, the Government is responsible for abatement of vinyl asbestos tile it specified as floor covering for over 60% of the Premises.

The essential holding of Spearin was recently noted by the Supreme Court in *Hercules Inc. v. U.S.* 516 U.S. 417, 425 (1996):

> When the Government provides specifications directing how a contract is to be performed, the Government warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications. The specifications will not frustrate performance or make it impossible. It is quite logical to infer from the circumstance of one party providing specifications for performance that that party warrants the capability of performance.

The Supreme Court however, refused to extend the contractual warranty provided by *Spearin* beyond the protection of the contractor to third-party tort claims. *Id.* Similarly, the court in *Lopez v. A.C.S. Inc. et al. v. United States*, 858 F.2d 712 (Fed.Cir. 1988) refused to extend *Spearin* coverage to asbestos tort claims raised by Naval shipyard workers exposed to asbestos

on the job against suppliers of asbestos containing insulation to the Navy. Consistent with the later *Hercules* holding, *Spearin* does not give rise to an implied warranty for which personal injury damages may be recovered.

However, the Government cites directly to the long-standing precedent of this Court, *Poorvu v. U. S.,* 420 F.2d 993 (Ct.Cl. 1970). *Poorvu* could hardly be more analogous to the present situation. In *Poorvu*, the government entered into a contract with a builder-developer (like Collins) to construct a to-order Post Office building. Although the Post Office department commissioned the original plans from a local architect in Kansas City in order to secure bids for the construction and leasing of the building, the final plans were subject to substantial negotiation (as in this case). In fact, "the parties agreed to 22 changes in the plans in order to reduce the cost of construction . . .." 420 F.2d at 996. These changes resulted in a reduced rental rate over the initial term (as in this case). The Post Office occupied the building in 1958. The original developer sold the building and its rights under the lease to Poorvu in 1961. 420 F.2d at 997.

In the early 1960's, sewer breaks were experienced at the building. Repairs of these breaks were initially paid for by Poorvu (as was initial asbestos abatement in this case) but it was later discovered that the Government's change of the original plan was the cause of the sewer pipe breaks. *Id.* Poorvu filed a claim against the Government.

The *Poorvu* Court relied heavily on *Spearin* in finding for the Poorvus. The Court found that where the Government chooses "to design the building itself and require the low bidder to construct in it accordance with the plans, and warrant that it will have been constructed in a workmanlike manner. If the plans prove insufficient, it is the government, as the owner, upon

whom the defects will take their toll." 420 F.2d at 999. The fact that the Government was not the owner of the building but the long-term tenant did not change the outcome for the Court:

> I can see no reason why a warranty which would arise if the government*1000 were the owner should not arise in this situation when it is the designer-lessee. This conclusion becomes more obvious when it is realized that the government could not avoid a lease on a building which was built for it, in accordance with plans supplied by it, on the ground that the building was not sufficient for its needs. In the present situation, as in the situation where it is to be the owner of the facility, the government must answer for damage incurred because of inadequate plans it has furnished.

420 F.2d at 999-1000. The fact that the defect in the plans appeared long after the construction of the building likewise gave the Court no pause:

> Nor does the fact that in this case the proof of the deficiency in the plans did not manifest itself until after the building was standing for a number of years-unlike the *Spearin-Laburnum-Luria* situation where it becomes known during construction-remove it from the purview of the principles enunciated above. It would make little sense to impose the obligation of an implied warranty and then limit the life of the warranty to the period of construction. It is an implied warranty that the plans, if followed, will result in a properly constructed building; not merely a warranty that the contractor will be able to build a building within a given time period for a certain price.

*Id.*

The Government attempts to distinguish *Poorvu* by contending that in this case, the Government "did not supply detailed plans and specifications on how to construct the building." Such a contention completely discounts the 18 pages of exacting specifications attached to the initial solicitation (App. 47-64), including the pages of specifications where "vinyl asbestos tile" was specified (App. 50, 51, 52, 53 and 54). Collins had no choice whether to comply with this specification or not if it was to secure the contract:

> The warranty applies only to "design specifications" because only by utilizing specifications in that category does the government deny the contractor's discretion and require that work be done in a certain way. When the government imposes such a requirement and the contractor complies, the government is bound to accept what its requirements produce.

*PCL Construction Services, Inc. v. U.S.,* 47 Fed.Cl. 745, 795 (2000). This Court further noted in *Wm. T. Thompson Co. v. U.S.* 26 Cl.Ct. 17, 26 (1992):

> The implied warranty of specification is the method by which the court can allocate the risk of the faulty specification to the Government, which created the specification, rather than to the contractor, who actually built the defective item that caused the damage.

The fact that the defect surfaced at the conclusion of the full occupancy of the Premises is without any moment, given the holding of *Poorvu*, approved in *Thompson* (26 Cl.Ct. 25).

The Government also claims that the specified vinyl asbestos tile was not a "defective" product. If that is correct, why would the 1986 GSA standard lease prohibit "asbestos-containing" materials "whether friable or non-friable"? (App. 173) The essence of the warranty implied by *Spearin* and its progeny is that damages suffered by a contractor as a result of a design specification required by the Government are allocated to the Government: "the government must answer for damage incurred because of inadequate plans it has furnished." *Poorvu, supra*, 420 F.2d at 1000.

Moreover, leaving asbestos containing vinyl tile and its asbestos containing mastic in place, lessens the value of the estate of the lessor. Thus, it falls squarely within the waste concepts discussed in part C of this Brief (pp. 20-25). This oft quoted passage from *Bostwick* sums up the obligation of the tenant with respect to the state of the premises upon return to the landlord:

> 'to treat the premises demised in such manner that . . . no injury be done to the inheritance, but that the estate may revert to the lessor undeteriorated by the wilful or negligent conduct of the lessee.' * * * This implied obligation is part of the contract itself, as much so as if incorporated into it by express language. It results from the relation of landlord and tenant between the parties which the contract creates. * * * It is not a covenant to repair generally, but to so use the property as to avoid the necessity for repairs, as far as possible. * * * '

*U. S. v. Bostwick, supra*, (94 U.S. at 66; *Riverview Properties v. U. S.,* 102 F.Supp. 934, 936-937 (M.D.Pa. 1952).

## V. CONCLUSION

For the foregoing reasons, Collins National respectfully requests that the Court deny Defendant's Motion for Partial Summary Judgment and award such other relief as the Court deems appropriate.

DATED: May 30, 2006

Respectfully submitted:

TIGHE PATTON ARMSTRONG TEASDALE, PLLC

By: ______________________

David Taylor, Esq.
Tighe Patton Armstrong Teasdale, PLLC
1747 Pennsylvania Ave., N.W. Suite 300
Washington, DC 20006
Tel: (202) 454-2855
Fax: (202) 454-2805

LAW OFFICE OF RICHARD S. BAYER

By: ______________________

Richard S. Bayer, Esq.
Law Office of Richard S. Bayer
1150 Silverado, Suite 116
La Jolla, CA 92037
Tel: (858) 454-1005
Fax: (858) 454-1021

Attorneys for Plaintiff