IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| COLLINS NATIONAL, a limited partnership, and COLLINS DEVELOPMENT CO., a California corporation as General Partner, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 05-563C (Judge Baskir) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**CONSOLIDATED STATEMENT OF UNCONTROVERTED FACTS**

Pursuant to the Court's Special Procedures Order, the parties propose the following statement of uncontroverted facts:

**A. DEFENDANT'S PROPOSED FACTS**

**1. On August 28, 1974, the General Services Administration ("GSA") issued a solicitation for proposals to lease a total of 33,750 square feet of space in National City, California, to house the District Office of the Drug Enforcement Agency ("DEA") and its Regional Laboratory. App. at 1.**

**2. The solicitation contained general building requirements and specifications and required detailed plans and specifications from the Offeror to detail how those specifications would be met. App. at 14.**

**3. On October 31, 1974, Collins National ("Collins") submitted its initial proposal to lease space to the United States with a starting rental amount of $280,000 for the initial term. App. at 65-73.**

**4. Collins' offer was subsequently amended, revised and clarified on December 13, 1974, January 17, 1975, March 12, 1975, and May 30, 1975. App. at 74-80.**

**5. On December 13, 1974, Collins amended its bid to include, among other changes, vinyl asbestos tile and base, which reduced the proposed rental amount by $4,300. App. at 74.**

**6. On January 17, 1975, Collins stated in its correspondence: "If, however, you desire to use an alternate grade of carpet or VAT [vinyl asbestos tile], a savings would be obtained per our letter dated October 31, 1974." App. at 77.**

**7. Due to other cost savings proposed, Collins' final bid tendered on May 30, 1975 was for annual rent in the amount of $225,795. App. at 80.**

**8. On June 13, 1975, the GSA accepted Collins' offer and entered into a ten-year lease of the building located at 402 West 35th Street, National City, California (Lease No. 09B-74817). App. at 81-82.**

**9. The lease specified that vinyl asbestos tiles be used in certain rooms in the Regional Laboratory, including the gas storage room, main laboratories one and two, special purpose laboratory, Mass. Spec. Lab, X-Ray Lab, TLC Lab, Instrument Labs 1 and 2, Compressor Room, men's and women's locker rooms, employees' lounge, vault (inner and outer), administrative storage room, tool workshop room, file room, fingerprint room, the chemical storage and glassware storage rooms. App. at 124-28.**

**10. Under the terms of the lease, Collins was required to maintain the ~~exterior and interior of the building, including but not limited to maintaining the~~ mechanical and electrical equipment and systems, elevators and escalators, fire equipment, plumbing and sewage systems, painting and providing cleaning and janitorial services. App. at ~~106-111~~.**

Plaintiff's objection: The Government mischaracterized the lease provisions and miscites the Appendix. A correct statement of the lease provisions would be:

Under the terms of the lease, Collins was required to maintain the roof, the exterior walls, the exterior doors, the exterior windows, ~~exterior and interior of the building, including but not limited to maintaining~~ the mechanical and electrical equipment and systems, elevators and escalators, fire equipment, plumbing and sewage systems. Lessor was required to provide painting and providing cleaning and janitorial services. App. at ~~106-111~~ 108.

**11. The lease provided that Collins would "maintain the demised premises, including the building and any and all equipment, fixtures and appurtenances, furnished by the Lessor under this lease in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees." App. at 119.**

**12. The lease stated that Collins was required to "comply with all codes and ordinances applicable to the ownership and operation of the building in which the leased space is situated and, at his own expense, to obtain all necessary permits and related items." App. at 112, 120.**

**13. On March 4, 1985, the GSA notified Collins that it was "surveying all leased space to determine which buildings contain friable or asbestos bearing materials such as insulation, pipe lagging, vinyl asbestos tile, etc." and requested Collins to complete an asbestos certification. App. at 151.**

**14. In response, Collins procured the services of Environmental Systems Associates ("EVA"), an industrial hygiene consulting company, to conduct a survey of the building to determine**

**if there was any asbestos in the building. App. at 152-154.**

**15. EVA inspected all areas of the building and took samples of "suspect materials" including floor tiles, sprayed-on accoustical ceiling material, material used in the drop ceiling, selected fume hoods, and gloves used in the laboratory. App. at 152.**

**16. EVA found chrysotile asbestos in the fume hoods and gloves used in the laboratory. EVA stated that the asbestos in the laboratory fume hoods was intact and no exposed areas were observed. App. at 152.**

**17. EVA advised safety personnel to "label the suspect material for future reference and if any drilling, grinding, or abrasion of the surface is attempted, wet methods should be used and the cleanup of any debris from such activity should be done with proper equipment." App. at 152.**

**18. EVA reported that "[n]o other materials were identified as containing asbestos material." App. at 152.**

**19. On October 7, 1986, the GSA reported to the DEA that decorative ceiling material applied in the laboratory and office space also contained 10-15% "Chrysolite" [sic] asbestos. App. at 213.**

**20. On October 16, 1986, the GSA informed Collins that the results of a survey found chrysotile asbestos in the decorative ceiling material and requested that Collins comply with all aspects of PBS.P.5900.2B, Section 015546, Safety and Health requirements. App. at 214.**

**21. On May 1, 1986, the GSA issued a solicitation to lease the building at 402 West 35th Street, National City, California. App. at 155-212.**

**22. On November 25, 1986, the GSA entered into a new lease with Collins to lease the building located at 402 West 35th Street, National City, California (Lease No. 09B-86764) from November 1, 1986 to October 31, 1991. App. at 216.**

**23. On November 25, 1986, the GSA and Collins also entered into a supplemental lease agreement, which inserted the following paragraph regarding asbestos control: "14. It is agreed and understood between the Lessor and the Government that the precautions for the control of asbestos outlined in PBS.P.5900.2B, Section 01546, Safety and Health, will be observed." App. at 266.**

**24. Supplemental lease agreements extended the lease period until April 30, 2003. App. at 267-79.**

**25. The 1986 lease provided that Collins "maintain the demised premises, including the building and all equipment, fixtures, and appurtenances furnished by the Lessor under this lease in good repair and tenantable condition, except in case of damage arising from the act or negligence of the Government's agents or employees," and that Collins "comply with all codes and ordinances applicable to the ownership and operation of the building . . . ." App. at 248.**

**26. The 1986 lease, which incorporated the terms of the solicitation, contained a clause entitled "Asbestos." That clause stated:**

> **No asbestos-containing fireproofing or insulation on building structures, accoustical treatment, molded or wet-applied ceilings or wall finishes/decorations, whether friable or non-friable, will be permitted. If present, such materials must be removed by the successful offeror prior to occupancy by the Government.**
>
> **No friable asbestos-containing boiler lagging or pipe insulation is acceptable. If present, such materials shall be removed, encapsulated or enclosed.**
>
> **. . .**
>
> **Post-asbestos-abatement air monitoring requirements, in accordance with GSA procedures, are to be complied with by the lessor when applicable.**

**App. at 237.**

Plaintiff's Objection: The Government did not include the entire "Asbestos" provision from the 1986 Lease.

**27. Collins ~~certified and represented in the 1986 lease that the building complied with requirements in the Asbestos clause.~~ App. at 262.**

Plaintiff's objection: The language of the "Asbestos representation" speaks for itself and should be fully set forth. Because the 1986 lease has to be read as a whole, Collins believes that the "Asbestos representation" was superseded by the Supplemental Lease Agreement and the specific provision of the 1986 lease accepting the building, with asbestos containing material, "as is." App. 241. Collins believes the more appropriate fact would be:

Collins executed the 1986 lease which contained the following language: "The offeror represents and certifies as part of its offer that the proposed space, common use areas and mechanical spaces having a common air distribution zone with the offer space [X] complies, [ ] does not comply with the requirements defined in the clause entitled 'Asbestos.'" ~~certified and represented in the 1986 lease that the building complied with requirements in the Asbestos clause.~~ App. at 262.

**28. The 1986 lease granted the Government "the right, upon reasonable notice, to inspect and perform bulk sampling and analysis of suspected asbestos-containing materials and to monitor the air for asbestos fibers." App. at 248.**

**29. ~~The 1986 lease allowed the Government to terminate the lease if Collins had misrepresented the presence of asbestos in its certification or to require Collins to remove or otherwise abate and control any friable asbestos in the building.~~ App. at 251.**

Plaintiff's objection: Although the 1986 lease contains clause 18 at App. 251 regarding the Government's rights with respect to the discovery of asbestos, the Government was well aware of the presence of asbestos containing material in the building at the time the 1986 lease was signed and the Government accepted the premises "as-is." App. 241. Consequently, the Government waived whatever rights it had with respect to the "Asbestos representation" by executing the Supplemental Lease Agreement No. 1 (App. 266) on or before the date the Government executed the 1986 lease.

**30. A Building Inspection/Hazardous Operations Form dated August 8, 1989 indicated that "renovations underway in areas which contain asbestos; no precautions being taken." App. at 294. The 1989 report noted that there was asbestos in two places: (1) friable asbestos in the sprayed-on acoustical ceiling material found in the corridors, evidence vaults, and some offices (about 12,000 feet), and (2) non-friable asbestos in the floor tile and mastic (about 20,000 feet). App. at 295.**

**31. On September 12, 1989, Collins' contractor abated 600 square feet of friable asbestos of the accoustical ceiling material. The contractor hand-scraped the accoustical ceiling material using wet removal procedures and disposed of the material. App. at 313.**

**32. In 1990, Collins tested for asbestos in the vinyl floor tiles and mastic. The test results showed 2 percent chrysotile asbestos in the mastic only. Collins believed that the asbestos, as it exist[ed], [wa]s in a safe 'non-friable' state and [wa]s considered a non-hazard." App. at 314-315.**

**33. Collins proposed that the existing flooring should be left alone and that a new vinyl floor should be "overlaid" on top of the**

**existing flooring. Collins proposed that only the most severely damaged tile areas should be removed through asbestos abatement procedure. Collins believed that this would result in a "long lasting and durable floor." App. at 314-315.**

**34. The GSA concurred with Collins' proposal to remove only the most damaged tiles and overlay new tiles on top of the existing flooring. App. at 319.**

**35. On October 12, 2000, the U.S. Public Health Service reported the results of earlier inspections of vault one and vault two of the laboratory for the presence of any asbestos. The 2000 report found that there was asbestos-containing ceiling texture over-sprayed onto ductwork and piping in both vaults. App. at 325.**

**36. The U.S. Public Health Service report recommended that the asbestos-containing ceiling texture in vault one be removed. Because the asbestos-containing ceiling texture in vault two was in good condition, the report recommended that the ceiling texture in vault two should be placed in an "Operations and Maintenance program until a change in condition or renovation activities require removal." App. at 325.**

**37. The U.S. Public Health Service report also found that the level of airborne asbestos in the building was below applicable regulations. App. at 329.**

**38. On December 11, 2000, the GSA informed Collins about the results of this report and requested that Collins respond with an asbestos abatement plan. App. at 359.**

**39. On or about August 24, 2001, Collins abated 150 square feet of asbestos on the ductwork and fire sprinkler lines, which form part of the ceiling overspray, in vault one. App. at 361-65.**

**40. On December 7, 2002, the URS Corporation ("URS") performed a pre-renovation/demolition survey for "asbestos containing materials (ACM), lead-based paint (LBP), polychlorinated biphenyls (PCBs), mercury and hazardous materials on a South West U. S. Drug Enforcement Agency (DEA) Laboratory facility located at 402 West 35th Street, in National City, California." App. at 375-472.**

**41. The URS report found friable ACM on spray-on ceiling material located in the hallways, vaults, and offices. The URS report further found non-friable ACM in the vinyl floor tiles and mastic; spray-on ceiling material located in the hallways, vaults, and offices;**

**fume hood transit panels; building joint putty material; and roofing mastic. App. at 375.**

**42. The URS report stated in part:**

> **The presence of ACM in the facility does not mean that the health of the occupants is endangered. If ACM remains in good condition and is not disturbed, exposures to asbestos are expected to be negligible. However, when ACM deteriorates, is disturbed or damaged, such as during renovation or demolition operations, asbestos fibers may be released creating a potential health hazard for building occupants and construction personnel.**

**App. at 386.**

**43. Based on this survey, URS compiled specifications for decommissioning the building. App. 473-563. The decommissioning specifications not only included the removal of ACMs in the ceiling material, vinyl floor tiles, roofing mastic, the fume hood transite panels, but also included removal of interior walls, work stations, utilities, holding cells, vaults, the HVAC system, fixtures and plumbing in the bathroom, fire sprinkler system, incinerator pad, and perimeter fencing etc. App. at 492-96.**

**44. On April 30, 2003, the contracting officer ("CO") conducted**

**a final walk-through of the building. The CO's report indicates that the "space is ready for return to the Lessor . . . with no damage, other than normal wear & tear that would be expected from a long term tenancy in a laboratory." App. at 586. The report "acknowledged that removal of drug residue has not taken place as of the date of this exit walkthrough." Id.**

**45. URS subcontracted the asbestos abatement and demolition work to Clauss Construction ("Clauss"). Clauss performed the work between June and August 2003. App. at 603.**

**46. On January 26, 2004, URS certified that the asbestos and dust containing controlled substances had been properly removed and disposed of from the DEA facility. App. at 603.**

**47. On November 4, 2003, Collins filed a claim with the CO for the amount of costs incurred in removing asbestos and demolishing parts of the building due to the presence of controlled substances. Collins also filed a claim for three months of hold-over rent during which Collins National performed the asbestos abatement and**

**demolition work and one-month of hold-over rent due to the GSA not**

**returning the keys to the building until May 30, 2003. App. at 594.**

**48. On November 10, 2004, the CO issued his final decision granting Collins hold-over rent for one month in the amount of $78,865. The CO denied Collins' remaining claims. App. at 622.**

## B. PLAINTIFFS' PROPOSED FACTS

**49. About 20,000 square feet of the building's floors were covered with asbestos containing vinyl tile, representing approximately 60% of the building's floor surfaces. App. 1, 295.**

**50. At the time the 1986 Lease was executed (November 25, 1986) the Government knew:**

**a) decorative ceiling material applied to the ceilings contained asbestos (App. 214, 291, 295);**

**b) laboratory fume hoods and gloves used in the labs contained asbestos (App. 152); and**

**c) vinyl asbestos tile covered about 60% of all floors in the Premises (App. 124-128).**

Government's Objections: Appendix 291 and 295 does not support plaintiffs' assertion in paragraph 50a, because the report is dated August 8, 1989. Appendix 124 to 128 does not support plaintiffs' assertion in paragraph 50c; Appendix 124 to 128 demonstrates only that the lease specified vinyl asbestos tiles in certain parts of the building.

**51. As part of the "Special Space Requirements" regarding "the space at 402 West 35th Street, National City, California, " the Government "accepted [the space] in its present configuration . . .." App. 241.**

Government's Objection: Plaintiffs mischaracterize this lease provision. The referenced provision states in full: "Special space features and improvements within the Government's space are accepted in an 'as is' condition." That provision is only applicable to special space features and improvements, not to the building in general. Plaintiff ignores the applicable "as is" provision which applies to the entire lease and specifically to the "Asbestos" provision:

> Wherever the notation, 'Acceptable As Is' appears in this lease, the same shall mean that the relevant structure, configuration, facility, system or equipment is accepted by the Government as it exists at the commencement of the term of this lease; however, such notation shall not be construed to relieve Lessor of any repair, maintenance, operation or other requirement of this lease.

App. 218, 237.

**52. As part of the Special Space Requirements of the 1986 lease, the Government drafted specifications provided: "Special space features and improvements within the Government's space are accepted in "as-is" condition." App. 241.**

**53. Maria Dent of the GSA contacted Collins in July 2002 regarding cost estimates for de-commissioning. Ms. Dent told Collins they should contact ONYX Environmental Services regarding a contract to "perform cleanups." App. 634**

**54. ONYX made arrangements with GSA to visit the DEA laboratory on August 27, 2002, "to determine costs for asbestos abatement following their relocation" and "a cost estimate for chemical relocation as well." (App. 635)**

Government Objection: Plaintiffs mischaracterize the cited document. The cited document demonstrates only that Onyx Environmental Services contacted GSA via e-mail about inspecting the DEA laboratory on August 27, 2002 for the purpose of providing a cost estimate for asbestos abatement and/or chemical relocation. App. 635.

**55. On August 28, 2002 Tina Grover at the GSA wrote to inform Collins where to send "cost proposals" for "the decomissioning of the existing DEA lab." Grover told Collins:**

> **Jenalyn's office will be evaluating the proposals, monitoring the project, and processing the final payment. I will be issuing the Supplemental Lease Agreement to Collins National who will actually be contracting directly with the vendor. Upon completion of the work and acceptance by the Government, the Government will make a lump sum payment to Collins National for the amount agreed upon.**

**App. 636.**

**56. During late 2002 and 2003, the GSA internally discussed similar decommissionings of other DEA laboratories, especially the one located in Maryland. App. 637-639.**

Government Objection: Plaintiffs mischaracterize the cited document. The cited documents demonstrate that there were e-mail communications between Government employees regarding what the proper scope of decommissioning of the DEA laboratory in National City, California, should be. App. 637-39.

**57. The GSA decided to use the Public Health Service to do an inspection to identify "those actions needed to decontaminate the space and return it to the Lessor. " App. 640.**

Government Objection: Plaintiffs mischaracterize the cited document. The cited document demonstrates only that Tina Grover wanted to contact the Public Health Service to perform an inspection of the DEA laboratory. Tina Grover stated in relevant part: "We know that there is asbestos and other environmental concerns in the building which are the Lessor's responsibility. GSA/DEA are only concerned with identifying those actions needed to decontaminate the space and return it to the Lessor. We need to make sure the Public Health Service understands this when we contract with them." App. at 640.

**58. The walk-through of the Premises with PHS to review what actions needed to taken by GSA took place on January 9, 2003. App. 641.**

Government Objection: Plaintiffs mischaracterize the cited document. The cited document demonstrates only that the GSA expected Norman Wright of the Public Health Service to walk through the building on January 9, 2003. App. at 641.

**59. The Public Health Service representative that conducted the walk through was Norman Wright. App. 643.**

Government Objection: See response to Plaintiffs' Proposed Fact No. 58.

**60. The Federal Occupational Health Service estimated it would cost $42,433 for required inspections and sampling necessary to determine the Government's share of clean up costs for the laboratory. App. 652.**

Government's Objection: Plaintiffs mischaracterize the cited document. The cited document does not identify the author of the report. The report states that the "purpose of the scope of work is to evaluate and determine what cleanup, if any, is necessary to remove any hazardous materials contamination caused by the government occupancy." App. at 646.

**61. Jenalyn Keodara at the GSA maintained a spreadsheet for relocation costs and cleanup costs under a Reimbursable Work Authorization issued by Michael Trevelino at the DEA. App. 666, 667, 668, 669.**

Government's Objection: Plaintiffs draw unsupported inferences from the cited documents. The cited documents demonstrate only that Jenalyn Keodara e-mailed Michael Trevelino a worksheet of estimated costs for relocation and decommissioning.

**62. The updated worksheet for the RWA reflected a blank space for "Environmental Clean-up in National City Lab." That space was still blank in the transmitted March 25, 2003 worksheet (App. 669), as well as the revised worksheet dated April 5, 2003. App. 666.**

**63. The Contracting Officer also indicated in his final walkthrough that "Upon completion of an analysis of the Lessors "Decommissioning" package by the Public Health Service, the removal of residue will be addressed at that time." App. 586.**

**64. Norman Wright, the Environmental Health Manager from the Public Health Service charged with reviewing the URS Decomissioning Survey and federal proposals (and the PHS representative who walked the building in January 2003), indicated in his report on May 2, 2003 that he:**

> **strongly suggest[ed] that samples be taken from all building material (concrete slab, masonry, vapor barrier, glass, window putty, all insulation, electrical, paint of circuit breaker panels, etc.) to determine if the best way to address the hazardous materials in the facility is to raze the building. The Government would of course be responsible for the removal of waste.**

**App. 675.**

Government Objection: The cited document does not support the assertion that Norman Wright was charged with reviewing the URS Decommissioning Survey and federal proposals. App. 675.

**65. Mr. Wright wrote in his report that "it is possible that contamination is extensive and that wall[s] will need to be decontaminated . . . ." Mr. Wright also reported that the "proposed de-contamination specifications by URS are in keeping with good practice with respect to removal of hazardous materials." App. 676.**

Government's Objection: Plaintiffs mischaracterize the cited document by quoting only a part of the document. Mr. Norman's report states in relevant part: "It is possible that contamination is extensive and that wall will be need to be decontaminated, but to assume that removal of the wall is the only solution is erroneous. Removal of walls, even with gross contamination may not be necessary to eliminated [sic] exposure. It is not clear if the lessor is concern about receiving a 'clean facility' or in having the Government pay for remodeling." App. at 676.

**66. After he received Mr. Wright's report, the Contracting Officer contacted Collins on May 6, 2003 to let Collins know that GSA had received the Wright report, and the CO would communicate the Government's position on its portion of the responsibility for decommissioning costs "within the next few days." (App. 677) He closed by saying: "[i]t's not been our intention to prolong any of your necessary actions with respect to the decomissioning." (*Id*.)**

Government's Objection: The cited document does not support the assertion that the contracting officer received Mr. Wright's report prior to May 6, 2003. In his May 6, 2003 e-mail, the contracting officer stated that he "received a report from our safety and environmental group." App. at 677. Plaintiffs draw an unsupported inference that this report is from Mr. Wright.

**67. On May 20, 2003 Michael Trevelino wrote an email to the GSA saying he had been "blind sided by this RWA [Reimbursable Work Authorization]." App. 665*.***

**68. GSA never obtained samples of all building material (concrete slab, masonry, vapor barrier, glass, window putty, all insulation, electrical, paint of circuit breaker panels, etc.).**

Government's Objection: Plaintiffs provide no support for this proposed finding of fact. The Special Procedures Order provides that the "absence of a fact should be included only if explicitly addressed in the record." Paragraph 12.

**69. GSA never hired any person to secure wipe samples of walls, ceilings or other surfaces.**

Government's Objection: Plaintiffs provide no support for this proposed finding of fact. The Special Procedures Order provides that the "absence of a fact should be included only if explicitly addressed in the record." Paragraph 12.

**70. The only evidence of contamination in the building is the evidence obtained by URS. App. 375-472.**

Government's Objection: The cited document does not support the assertion that the "only evidence of contamination in the building is evidence obtained by URS." This is an unwarranted inference. The Special Procedures Order provides that "inferences are not facts, and should be reserved for argument." Paragraph 12.

**71. Settled dust throughout the DEA facility and dust located in the ventilation system contained detectable levels of drugs. App. 627.**

Government's Objection: Plaintiff cites to Ronald A. Miller's expert opinion as stated in his recent affidavit dated April 24, 2006. As the Special Procedures Order states, "inferences are not facts, and should be reserved for argument." Paragraph 12.

**72. The fact that settled dust contained illegal drugs in the building meant that the drug residue needed to be removed before a subsequent user could make appropriate use of the building. App. 627.**

Government's Objection: Plaintiff cites to Ronald A. Miller's expert opinion as stated in his recent affidavit dated April 24, 2006. As the Special Procedures Order states, "inferences are not facts, and should be reserved for argument." Paragraph 12.

**73. The fact that settled dust contained illegal drugs in the building also meant that drug residue would settle in the asbestos-containing "popcorn" ceiling treatment and the other porous, friable asbestos located in the building. App. 627.**

Government's Objection: Plaintiff cites to Ronald A. Miller's expert opinion as stated in his recent affidavit dated April 24, 2006. As the Special Procedures Order states, "inferences are not facts, and should be reserved for argument." Paragraph 12.

**74. The standard way of addressing drug residue on non-porous surfaces would be to wipe the surface clean with a disinfectant and surfactant, using standard precautions to insure that the cleaning technician did not come in contact with the drugs. However, where the 30 year history of the building indicated that the drug residue had settled into the asbestos-containing popcorn ceiling material and other friable asbestos throughout the building, wiping down the surface would release friable asbestos into the air, endangering any further occupant of the building. App. 627.**

Government's Objection: Plaintiff cites to Ronald A. Miller's expert opinion as stated in his recent affidavit dated April 24, 2006. As the Special Procedures Order states, "inferences are not facts, and should be reserved for argument." Paragraph 12.

**75. The least expensive and safest method of dealing with drug contaminated asbestos containing material was to remove it with normal asbestos protective systems in place. App. 627.**

Government's Objection: Plaintiff cites to Ronald A. Miller's expert opinion as stated in his recent affidavit dated April 24, 2006. As the Special Procedures Order states, "inferences are not facts, and should be reserved for argument." Paragraph 12.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Bryant G. Snee

BRYANT G. SNEE
Assistant Director

s/ David Taylor

DAVID TAYLOR, ESQ.
Tighe Patton Armstrong
Teasdale, PLLC
1747 Pennsylvania Ave., N.W.
Suite 300
Washington, D.C. 20007
Tel: (202) 454-2855
Fax: (202) 454-2805
Attorney for Plaintiffs

June 23, 2006

s/ Nancy M. Kim

NANCY M. KIM
Trial Attorney
Commercial Litigation
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0546
Fax: (202) 514-8640

Attorneys for Defendant